W. FLETCHER, Circuit Judge,
dissenting:
I respectfully dissent.
In Friedman v. Boucher, 580 F.3d 847 (9th Cir.2009), we held that the taking of a DNA sample without a warrant, and without suspicion of a crime that the DNA sample would help solve, violated the plaintiffs clearly established Fourth Amendment rights. Proposition 69 requires that DNA samples be taken from all felony arrestees, with or without their consent, upon their arrest. There is no need for a warrant, and there is no need for suspicion of a crime that the DNA sample would help solve. Our decision in Friedman requires us to hold that Proposition 69 violates the Fourth Amendment.
Even if Friedman were not on the books, I would conclude that Proposition 69 is unconstitutional. My reasoning is straightforward. Fingerprints may be tak *1066 en from an arrestee in order to identify him — that is, to determine whether he is who he claims to be. But fingerprints may not be taken from an arrestee solely for an investigative purpose, absent a warrant or reasonable suspicion that the fingerprints would help solve the crime for which he was taken into custody. Hayes v. Florida, 470 U.S. 811, 814-15, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985); Davis v. Mississippi, 394 U.S. 721, 727-28, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); United States v. Ortiz-Hernandez, 427 F.3d 567, 576 (9th Cir. 2005); United States v. Garcia-Beltran, 389 F.3d 864, 865 (9th Cir.2004). DNA samples are not taken from felony arrestees under Proposition 69 in order to identify them. Rather, they are taken solely for an investigative purpose, without a warrant or reasonable suspicion. The taking of DNA samples from arrestees solely for that purpose is invalid under Hayes, Davis, Ortiz-Hemandez, and Garcia-Beltran.
I. Background
The four named plaintiffs were arrested for felonies in 2009. They were compelled under Proposition 69 to provide DNA samples immediately after their arrests. Two of the plaintiffs were never charged with crimes. The other two plaintiffs were charged with felonies, but the charges were dismissed. No warrants authorized taking any of the DNA samples. Nor was there a suspicion of any crime that the DNA samples would help solve.
Elizabeth Haskell was arrested on March 21, 2009, for allegedly trying to take a person from police custody during a San Francisco peace demonstration. She was taken to the San Francisco County jail, where she was ordered to provide a DNA sample. She was told that she would be charged with a misdemeanor if she refused to comply immediately. She provided a sample but states she would have refused if she had not been threatened. Haskell was never charged with a crime. She states, “I now live with the fear that my DNA might be falsely matched to a sample obtained from a crime scene, even if I remain completely law abiding. As a political activist, I also recognize the taking of DNA from those arrested during political activities as an intimidation tactic, increasing the cost of voicing any freedom of expression.”
Reginald Ento was arrested in early 2009 on suspicion of possessing stolen property. He was taken to the Sacramento County jail, where a sheriffs deputy collected a DNA sample without his consent. Ento states that the deputy told him that the DNA could be taken by force if necessary. He states, “Not long after my DNA sample was collected, the charges against me were dropped and I was released from custody. At no time during my contact with law enforcement officials was I ever informed that I could seek to have my DNA sample destroyed and information regarding my DNA removed from any law enforcement databases, based on the fact that the charges against me [were] dropped.”
Jeffrey Lyons Jr. was arrested on March 16, 2009, for allegedly trying to take a person from police custody during a demonstration outside the Israeli consulate. He was taken to the San Francisco County jail, where he was ordered to provide a DNA sample. He complied with the order. Lyons was charged with a felony, but the charge was dismissed. He states that after the charge was dismissed, “I called the San Francisco District Attorney’s office ... to ask for help in getting my DNA sample expunged____The woman at the District Attorney’s office said that I would have to file a motion and that I should talk to my lawyer. I then said that because my lawyer had been paid by the court I didn’t know whether I would *1067 have to pay him to do this; she said she didn’t know and suggested that I call the public defender’s office and that maybe they would help me.”
Aakash Desai is a graduate student at the University of California, Berkeley. He participated in a demonstration in Wheeler Hall on the Berkeley campus on November 20, 2009, protesting tuition increases as well as custodial furloughs and layoffs. Campus police arrested Desai and took him to the Berkeley city jail. Desai was told at the jail that he was being charged with felony burglary. He was told that if he refused to provide a DNA sample he would be charged with a misdemeanor and his bail would be increased. Desai then provided a DNA sample. He states, “When I went to court on the following Monday for my arraignment, I learned that no charges had been filed.”
In 1998, the California legislature passed the DNA Act, which created a program of warrantless DNA testing of individuals convicted of certain violent crimes. See 1998 Cal. Stat. ch. 696, § 2. In November 2004, California voters passed Proposition 69. Proposition 69 requires that DNA be taken from all individuals convicted of felonies. CaLPenal Code § 296(a)(1). It also provides, effective January 1, 2009, for expansion of the DNA program to felony arrestees. CaLPenal Code § 296(a)(2)(A)-(C).
Plaintiffs challenge the expansion to arrestees. Approximately 300,000 individuals are arrested for felonies in California each year. About a third of them are never convicted of the felonies for which they are arrested. Many, including two of the plaintiffs, are never even charged with felonies.
The arrestee is photographed and fingerprinted during the booking process. See CaLPenal Code § 7(21). The arrestee’s fingerprints are used to ascertain or verify his or her identity. Police officials then use the arrestee’s identity, thus ascertained or verified, to determine if he or she has already provided a DNA sample. If the arrestee has not already provided a DNA sample, officials compel the arrestee to provide one. Arrestees are told that they will not be released from jail until they provide a DNA sample and that they can be charged with a misdemeanor for refusing to provide one. Arrestees may be told that force can be used to obtain a DNA sample. See CaLPenal Code § 298.1(a)-(b).
A judicial determination of probable cause for the arrest is not required, either before arrest or before a DNA sample is taken. As a practical matter, Proposition 69 precludes a judicial determination of probable cause after the arrest, for it requires that the sample be taken “immediately following an arrest, or during the booking ... process or as soon as administratively practicable after arrest.” CaLPenal Code § 296.1(a)(1)(A). Proposition 69 nowhere mentions the desirability, or even the possibility, of a judicial determination of probable cause prior to taking the DNA sample.
After the arrestee has been identified and the DNA sample has been collected, the sample is sent to a laboratory where it is analyzed to create a DNA profile. The analysis occurs on average approximately one month after collection of the sample. California retains the sample after the analysis. See CaLPenal Code § 295.1(c).
Once the arrestee’s DNA sample is analyzed, the arrestee’s DNA profile is entered into the Combined DNA Index System (“CODIS”). CODIS is a system of federal, state, and local DNA databases operated by the National DNA Index System (“NDIS”). CODIS stores DNA records in a number of different indexes, including an Arrestee Index and a Convict *1068 Index. California arrestees’ DNA profiles are entered into the Arrestee Index.
All fifty states and the federal government participate in CODIS. Forty-seven states and the federal government collect DNA from all convicted felony offenders. Twenty-two states and the federal government collect DNA from some or all arrestees. Law enforcement agencies around the country can access the DNA profiles contained in CODIS.
CODIS uses 13 genetic markers — in technical terms, short tandem repeat polymorphisms (“STRPs”) — to create DNA profiles. The 13 genetic markers used by CODIS “ ‘were purposely selected because they are not associated with any known physical or medical characteristics.’ ” United States v. Kincade, 379 F.3d 813, 818-19 (9th Cir.2004) (en banc) (plurality) (quoting H.R.Rep. No. 106-900, pt. 1 at 36 (2000)). These markers are sometimes called “junk DNA.” Dr. Robert Nussbaum, Chief of Medical Genetics at the University of California, San Francisco, Department of Medicine, states, “There is currently no evidence that specific variants at any of the 13 core CODIS STRPs are themselves associated with traits of functional or medical significance.” Dr. Nussbaum states that in some cases the information associated with these STRPs “might allow one to infer functional or other medical information.” It is possible that “junk DNA” may be discovered, at some future time, to be directly associated with traits of functional or medical significance. See Kincade, 379 F.3d at 818 n. 6; see also, e.g., Gina Kolata, Reanimated ‘Junk’ DNA Is Found to Cause Disease, N.Y. Times, Aug. 20, 2010 at Al.
Once entered into CODIS, a DNA profile may be compared to the hundreds of thousands of crime-scene DNA profiles already entered into CODIS. A DNA profile provides an extremely accurate means of distinguishing one individual from another and a powerful tool to link particular individuals to DNA traces left at crime scenes. See Kincade, 379 F.3d at 818-19 (9th Cir.2004). A comparison between DNA profiles and crime-scene DNA samples is performed each week by CODIS. If there is a match between a crime-scene sample and a DNA profile (a “hit”), NDIS notifies the submitting laboratory, which then forwards the match information to the relevant law enforcement agency. Fingerprints linked to the DNA profile are used to identify the individual whose DNA profile matched a crime-scene DNA sample.
California conducts “familial searching” using DNA profiles in CODIS. A familial search identifies DNA profiles that are not a precise match to the crime-scene DNA sample, but are a close enough match to suggest that the individual whose DNA profile is in CODIS may be related to an individual who left DNA at the crime scene. Defendants state that, as a matter of policy, California does not now conduct familial searching using DNA profiles in the Arrestee Index (as distinct from the Convict Index). Plaintiffs contend, however, that the State will likely conduct familial searching of the Arrestee Index in the future. This is so, they contend, because a supervisor of the California DNA program has stated that all California DNA profiles are now entered into the Arrestee Index rather than the Convict Index, and that California cannot easily transfer those profiles from the Arrestee Index to the Convict Index after a conviction has been obtained.
The DNA samples and profiles taken from arrestees are retained unless an arrestee successfully applies for expungement. Expungement is a lengthy, uncertain, and expensive process. If no charges are filed, an individual must wait until the relevant felony’s statute of limitations has *1069 run before applying for expungement. See Cal.Penal Code § 299(b)(1). Depending on the felony for which the individual was arrested, the statute of limitations is three years or longer. See CaLPenal Code §§ 799-801. If charges are filed, an arrestee often need not wait until the expiration of the statute of limitations. Expungement may be sought after the charges are dismissed by a trier of fact before adjudication; after a conviction has been reversed and the case dismissed; after the arrestee has been found factually innocent; or after the arrestee has been acquitted of the charged offense. CaLPenal Code § 299(b)(l)-(4). Arrestees seeking ex-pungement must pay their own expenses and attorney’s fees. Unlawfulness of an arrest is not a ground for expungement.
After requesting expungement, an arrestee must wait a minimum of 180 days before a court can act. See CaLPenal Code § 299(c)(2)(D). The court has discretion to grant or deny the request for expungement. The denial of a request for expungement is a non-appealable order and cannot be reviewed by petition for writ. CaLPenal Code § 299(c)(1). The prosecuting attorney can prevent expungement by making an objection. See CaLPenal Code § 299(c)(2)(D). The State reports that California has expunged more than 900 convicted felon profiles and denied eight requests for expungement. It does not report expungement of any arrestee profiles.
California law provides some protection for individuals who have submitted DNA. DNA samples may be tested only to create the DNA profile. The DNA Act prohibits use of individual samples or profiles for purposes other than law-enforcement-related matching. See CaLPenal Code § 299.5(f)(1). However, California law does permit statistical studies using anonymous DNA profiles. Individuals who misuse DNA profiles in violation of California law are subject to imprisonment for up to a year and a fine of up to $50,000. See CaLPenal Code § 299.5(1). The district court found that there have been no reported instances of misuse.
II. Friedman v. Boucher
In Friedman, we addressed the taking of DNA testing from an arrestee without a warrant and without suspicion of a crime that the DNA might help to solve. Friedman was a pre-trial detainee in the Clark County, Nevada, jail, pending prosecution on criminal charges. Friedman v. Boucher, 580 F.3d 847, 851 (9th Cir.2009). Our opinion does not state whether the charges were felony or misdemeanor. A Las Vegas police officer forcefully took a DNA sample from Friedman at the direction of a county Deputy District Attorney who wanted the DNA for inclusion in the Nevada cold case data bank. Id. at 851. Friedman brought a § 1983 damages action against the police officer who took the sample and the district attorney who asked for it. We held that the defendants had violated Friedman’s clearly established Fourth Amendment right to be free from an unreasonable search. Id. at 858.
We had previously upheld the compelled taking of DNA samples from convicted felons. See United States v. Kriesel, 508 F.3d 941, 942 (9th Cir.2007); United States v. Kincade, 379 F.3d 813, 832 (9th Cir. 2004) (en banc); Rise v. Oregon, 59 F.3d 1556, 1562 (9th Cir.1995). However, we refused to extend these cases to a warrantless, suspicionless, compelled taking of DNA from a pre-trial detainee. Friedman, 580 F.3d at 856-58. We wrote that government interests justifying the unconsented taking of DNA from convicted felons in our earlier cases were not present: “The Nevada authorities extracted DNA from Friedman not because they suspected he had committed a crime, nor to aid in his *1070 reintegration into society, nor as a matter of his continuing supervision. Their purpose was simply to gather human tissue for a law enforcement databank, an objective that does not cleanse an otherwise unconstitutional search.” Id. at 858.
The majority gives five reasons why it believes our decision in Friedman does not control this case. None of the reasons is sufficient to distinguish Friedman.
First, the majority states, “[T]he DNA collection ... was conducted at the whim of deputy district attorney, acting without any statutory authority.... In contrast, the DNA collected in California from the Plaintiffs was approved in a statewide ballot referendum, which is a ‘basic instrument of democratic government[.]’ ” Maj. Op. at 1056. We made clear in Friedman that absence of an authorizing statute was not determinative of the appellant’s Fourth Amendment claim. We wrote that “adherence to a state statute does not guarantee compliance with the Fourth Amendment.” Id. at 853 (citing Virginia v. Moore, 553 U.S. 164, 171, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008)). Further, if the action of a state or local official is taken pursuant to an unconstitutional state law, it does not matter whether that law was enacted by the legislature or approved directly by the voters.
Second, the majority states, “[T]he police in Friedman singled out one individual for a search. In contrast, the California DNA Act is programmatic, and applies to all felony arrestees.” Maj. Op. at 1056. That a search is of a single person, at the discretion of an individual official, or of a group of people, mandated by a general rule, has never been a touchstone of Fourth Amendment analysis. Our opinion in Friedman did not rely on the fact that the search in that case was of a single individual. In rejecting the government’s arguments, we noted that “the government’s position ... would endorse routine, forcible DNA extraction.” 580 F.3d at 857 (emphasis added). We held such routine searches could not be justified by “ ‘the mere chance that desired evidence might be obtained.’ ” Id. (quoting Schmerber v. California, 384 U.S. 757, 769-70, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)). In holding the plaintiffs Fourth Amendment right to be clearly established, we wrote that our precedent “precluded the interpretation that the government could forcibly extract DNA from all pre-trial detainees as a matter of routine, unrelated to facility security considerations.” Id. at 859 (emphasis added).
Third, the majority states, “[T]he detective ‘forced Friedman’s jaw open and forcefully took a buccal swab from the inside of Friedman’s mouth.’ ... In contrast, California arrestees typically swipe the buccal swab along their own mouths; thus law enforcement officials do not usually use force.” Maj. Op. at 1057. California law expressly permits the use of force (as well as the use of criminal misdemean- or charges) if an arrestee refuses to provide a DNA sample. See Cal.Penal Code § 296.1(a). Indeed, Reginald Ento, one of the plaintiffs in this case stated that he was threatened with force when he declined to provide a sample. Our opinion in Friedman describes the physical compulsion used to take the DNA, but our holding does not turn on the use of physical force. We held the compelled search unconstitutional because it could not be justified by a permissible law enforcement objective. Friedman, 580 F.3d at 853-858 (rejecting all three of the State’s claims that an exception to the warrant requirement applied).
Fourth, the majority states, “[T]he California DNA Act imposes criminal penalties on people who misuse DNA information ...; Nevada had no such safeguards because no statute authorized the DNA col *1071 lection.” Maj. Op. at 1057. In Friedman, we expressed no concern that the officer might “misuse” the arrestee’s DNA sample in the sense of using it for purposes other than placement in the State’s cold case database. Friedman, 580 F.3d at 858. Rather, we held that the compelled taking of Friedman’s DNA and its placement in the database for investigative purposes was, in and of itself, a misuse. Whether a coerced DNA sample would be used, or misused, in other ways is irrelevant under Friedman.
Fifth, the majority states, “[T]he California DNA Act is clearly intended to allow law enforcement officials to identify criminal suspects, a purpose that we expressly approved in Rise [v. Oregon, 59 F.3d 1556, 1560 (9th Cir.1995)].... It is unclear what purpose the DNA collection in Friedman was intended to serve because it was not authorized by any Nevada statute or regulation.” Maj. Op. at 1057. The majority is wrong in stating that the purpose of Proposition 69 is to identify the felony arrestees who are compelled to provide DNA samples. Rather, as I discuss below, its sole purpose is to assist in criminal investigations. The majority is also wrong in stating that the purpose of the DNA collection in Friedman was unclear. We wrote that “the deputy district attorney wanted to put Friedman’s DNA sample in a cold case data bank.” Friedman, 580 F.3d at 851. We wrote, further, that the deputy district attorney “represented to a Nevada Justice Court that she had ordered the search to use Friedman’s DNA in the investigation of cold cases,” and that the police officer “wanted the sample as an aid to solve cold cases.” Id.
Unlike the majority, I conclude that our decision in Friedman controls this case. We are bound by Friedman unless we go en banc to overturn it.
III. Fourth Amendment
Even if Friedman were not controlling, I would conclude that Proposition 69 violates the Fourth Amendment.
The majority emphasizes the similarity between fingerprints and DNA. See, e.g., Maj. Op. at 1060 (“Given the certain constitutionality of fingerprinting and the clear analogy between fingerprinting and DNA identification under the DNA Act, as amended, privacy concerns here are diminished substantially.”). I agree that fingerprints and DNA are similar. Precisely because of that similarity, Proposition 69 is unconstitutional.
Fingerprints and DNA are both valuable law enforcement tools. In United States v. Kelly, 55 F.2d 67 (2d Cir.1932), an early appellate decision upholding fingerprinting, the court held fingerprinting was a permissible tool of identification, as “an extension of methods of identification long used in dealing with persons under arrest for real or supposed violations of the criminal laws.” Id. at 69. Subsequent court decisions have upheld the use of fingerprints for identification purposes. See, e.g., Napolitano v. United States, 340 F.2d 313, 314 (1st Cir.1965) (“Taking of fingerprints [of those released on bail] is universally standard procedure, and no violation of constitutional rights.”).
But there are limits on the purpose for which fingerprints may be taken. The Supreme Court has twice held that fingerprints may not be taken unless there is consent, a warrant, or probable cause. In Davis v. Mississippi, 394 U.S. 721, 722, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), police in Meridian, Mississippi, arrested and took the fingerprints of “at least 24 Negro youths,” including Davis, as part of a rape investigation. The police were required to have probable cause in order to arrest Davis. See, e.g., Draper v. United States, 358 U.S. 307, 310, 79 S.Ct. 329, 3 L.Ed.2d *1072 327 (1959) (“The crucial question ... is whether [the arresting officer had] ‘probable cause’ within the meaning of the Fourth Amendment ... to believe that petitioner had committed or was committing a violation of the narcotic laws.” (footnote and internal citations omitted)).
Davis’s fingerprints, taken by the police, matched fingerprints found on a windowsill of the victim’s home. Based in part on that match, Davis was convicted and sentenced to life in prison. The Court held that the fingerprint evidence should have been suppressed because it had been taken in violation of the Fourth Amendment. The Court noted that the state had conceded that Davis had been arrested without probable cause. Davis, 394 U.S. at 723, 89 S.Ct. 1394. The Court rejected two reasons argued in support of taking Davis’s fingerprints — that the fingerprints had been taken as part of an investigation into a crime and that fingerprints are a particularly reliable kind of evidence. The Court wrote, “[T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment.” Id. at 726, 89 S.Ct. 1394. It wrote, further, “[W]e find no merit in the suggestion ... that fingerprint evidence, because of its trustworthiness, is not subject to the proscriptions of the Fourth and Fourteenth Amendments. Our decisions recognize no exception to the rule that illegally seized evidence is inadmissible at trial, however relevant and trustworthy the seized evidence may be as an item of proof.” Id. at 723-24, 89 S.Ct. 1394.
In Hayes v. Florida, 470 U.S. 811, 812, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), police in Punta Gorda, Florida, were investigating a series of burglary-rapes. After interviewing over thirty men who generally fit the description of the assailant, “investigators came to consider [Hayes] a principal suspect.” Id. Police went to Hayes’s house. They told him that he could either come to the police station voluntarily to be fingerprinted or that he would be arrested. Police then arrested Hayes and took him to the station, where they took his fingerprints. The police were required to have probable cause in order to arrest Hayes.
Hayes’s fingerprints matched those left at the scene of one of the crimes. Id. at 813, 105 S.Ct. 1643. Based in part on the match, Hayes was convicted of burglary and sexual battery. The Court held that Davis required suppression of the fingerprints. It wrote that there had been, in fact, no probable cause. It wrote, “Here, as in Davis, there was no probable cause to arrest, no consent to the journey to the police station, and no judicial authorization for such a detention for fingerprinting purposes.... None of our later cases have undercut the holding in Davis that transportation to and investigative detention at the station house without probable cause or judicial authorization together violate the Fourth Amendment.” Id. at 814-15, 105 S.Ct. 1643.
The Court in Hayes wrote in dictum that in some circumstances fingerprints could possibly be taken without probable cause. It wrote:
None of the foregoing implies that a brief detention in the field for the purpose of fingerprinting, where there is only reasonable suspicion not amounting to probable cause, is necessarily impermissible under the Fourth Amendment. There is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, [and] if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect’s connection with that crime....
*1073 Id. at 816-17, 105 S.Ct. 1643 (internal citations omitted).
Relying on Davis and Hayes, we have distinguished between fingerprint evidence taken for identification and for investigative purposes. In United States v. Garcia-Beltran, 389 F.3d 864, 865 (9th Cir.2004), the government conceded that arresting officers lacked probable cause for the arrest of the defendant. It nonetheless argued for the use of his fingerprints, on the ground that they had been taken merely as evidence of his identity. We held that fingerprints could be taken for identification purposes, but could not be taken solely for investigative purposes. We remanded to the district court for a determination of the purpose for which the fingerprints had been taken. Id. at 866-868. We held the same thing a year later in United States v. Ortiz-Hernandez, 427 F.3d 567 (9th Cir.2005). We wrote, “It is established law under Hayes and Davis that if fingerprints are taken for investigatory purposes, they must be suppressed in a criminal trial.” Id. at 576; see also United States v. Olivares-Rangel, 458 F.3d 1104, 1115-16 (10th Cir.2006) (“[I]n determining whether the fingerprint evidence in this case should be suppressed, we must determine the original purpose for arresting and later fingerprinting Defendant; that is, was Defendant fingerprinted merely as part of a routine booking or processing procedure or was the illegal arrest in part for the purpose of obtaining unauthorized fingerprints so Defendant could be connected to additional alleged illegal activity.”); United States v. Guevara-Martinez, 262 F.3d 751, 755-56 (8th Cir.2001) (suppressing fingerprints taken for investigatory purposes after an arrest without probable cause).
I would apply to DNA the law that we already apply to fingerprints. Under that law, if DNA is taken from arrestees under Proposition 69 for purposes of identification, that taking is permissible. However, if it is taken solely for purposes of investigation, that taking is a seizure in violation of the Fourth Amendment.
The meaning of “identification,” as used in our caselaw, is the conventional meaning of the term. Identification is a determination of who someone is — his or her name, along with identifying information such as date of birth, address, and the like. In Garcia-Beltran, we contrasted investigation, which was an attempt “to connect [the defendant] to alleged criminal activity,” to identification, which was an attempt to determine if he was “really who he says he is.” Garcia-Beltran, 389 F.3d at 865, 867. Similarly, in Rise, we drew a “constitutionally significant distinction between the gathering of fingerprints from free persons to determine their guilt of an unsolved criminal offense and the gathering of fingerprints for identification purposes from persons within the lawful custody of the state.” Rise v. Oregon, 59 F.3d 1556, 1560, overruled on other grounds by City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) and Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001).
The majority in this case employs an idiosyncratic, expansive definition of “identification,” including investigation within that definition. The majority writes, “ ‘Identification’ encompasses not merely a person’s name, but also other crimes to which the individual is linked.” Maj. Op. at 1062-63. “The collection and use of DNA for identification purposes is substantially identical to a law enforcement officer obtaining an arrestee’s fingerprints to determine whether he is implicated in another crime.” Id. at 1062-63. The majority writes, further,
Plaintiffs contend that DNA profiling is unnecessary because law enforcement officers already identify arrestees using traditional fingerprinting. However, *1074 this argument ignores the significant advantages of DNA profiling over fingerprinting. Criminals can easily hide their fingerprints by wearing gloves, but they cannot mask their DNA.
Id. (emphasis added). The majority’s statement that criminals “can easily hide their fingerprints by wearing gloves” makes clear, if it was not clear already, that it includes investigation in its definition of identification. Under our caselaw’s definition of identification, it makes no sense to say that a criminal can hide his identity by wearing gloves. A criminal wears gloves while he is committing a crime, not while police are identifying him at the police station.
Proposition 69 employs the same idiosyncratic, expansive definition of “identification.” California’s DNA Act, which includes Proposition 69, provides that the California Department of Justice “shall perform DNA analysis and other forensic identification analysis ... only for identification purposes.” Cal.Penal Code § 295.1(a). Yet it is clear that DNA samples taken under Proposition 69 are used solely for investigative purposes. The text of Proposition 69 makes clear that its objective is solving crime. The phrases “solve crime” or “crime solving” are used five times in the text of the proposition. See, e.g. Cal. Prop. 69, § II(d)(l)-(d)(2) (2004) (“Expanding the statewide DNA Database and Data Bank Program is [t]he most reasonable and certain means to accomplish effective crime solving in California” and is “[t]he most reasonable and certain means to solve crime as effectively as other states.... ”); id. at § II(c) (“Law enforcement should be able to use the DNA Database ... to substantially reduce the number of unsolved crimes [and] to help stop serial crime by quickly comparing DNA profiles of qualifying persons and evidence samples with as many investigations and cases as necessary to solve crime and apprehend perpetrators.... ”).
The ballot argument in favor of Proposition 69, contained in the official voters’ pamphlet, focused on the crime-solving potential of DNA. The ballot argument began, “In California, the remains of a boy missing for two decades are finally identified. Two cold murders are solved in Kansas. And in Texas, a serial sexual predator is captured. The cases are cracked thanks to technology police are calling the fingerprints of the 21st century.” Ballot Pamp., Gen. Elec. (Nov. 2, 2004), argument in favor of Prop. 69 (emphasis removed) (internal citations and quotations omitted), available at http://vote2004.sos.ca.gov/ voterguide/propositions/prop69-arguments. htm. The ballot argument continued, stating that taking a DNA sample from an arrestee “is more efficient and helps police conduct accurate investigations. No wasting time chasing false leads[.]” Id.; see also People v. Buza, 197 Cal.App.4th 1424, 129 Cal.Rptr.3d 753, 774-75 (2011) (listing additional examples).[1]
The protocol for taking DNA samples from arrestees under Proposition 69 also makes clear that the samples are taken from arrestees not for identification, but rather for investigation. As described above, the first step at booking is to take the arrestee’s fingerprints, which are then used to identify him. Once police have identified the arrestee, they check to determine whether he has already given a DNA sample. If he has, no additional sample is taken. If he has not, a sample is taken. After analysis of the sample, the arrestee’s DNA profile is sent to CODIS. It takes a month, on average, for the DNA *1075 analysis to be performed. By that time, the arrestee has long since been identified. Indeed, the arrestee must be identified before his DNA sample can be taken.
Even under the Supreme Court’s dictum in Hayes, Proposition 69 violates the Fourth Amendment. Under the Hayes dictum, DNA may not be taken from an unconsenting arrestee unless there is “reasonable suspicion” that the arrestee has committed a criminal act and there is a “reasonable basis” to believe that the arrestee’s DNA will “establish or negate the suspect’s connection with that crime.” Hayes, 470 U.S. at 817, 105 S.Ct. 1643 (emphasis added). A DNA sample is not taken under Proposition 69 because there is reasonable suspicion that the arrestee has committed a criminal act and that the DNA will help solve “that crime.” Rather a DNA sample is taken because a person has been arrested for a felony. The DNA is taken from the arrestee as a matter of course, without the need for any suspicion that he has committed any crime that the DNA will help solve. The DNA is taken because there is a possibility that the DNA may help solve some other crime — a crime about which the police taking the DNA have no knowledge, indeed a crime that may not even exist.
The majority makes two objections to this analysis. First, the majority writes:
The dissent’s key argument collapses, however, because he completely ignores the fact that the California DNA Act clearly requires that law enforcement officers may only compel DNA collection upon a finding of probable cause that the individual has committed a felony. Moreover, each of the four cases on which the dissent relies for some of his remarkable theories — Hayes, Davis [], Ortiz-Hemandez [ ], and Garcia-Beltran [] — involved the compelled taking of fingerprints without probable cause. This distinction completely undermines our dissenting colleague’s novel interpretation of the Fourth Amendment, and his reliance on the four cited cases.
Maj. Op. at 1060-61 (citations and emphasis omitted).
The majority misreads these cases. In all four cases, there had indeed been a determination of probable cause for the arrest. That determination had been made by the police, as a necessary precondition for making the arrests, just as it must be made by the police under Proposition 69. The Supreme Court in Hayes and Davis, and our court in Ortiz-Hemandez and Garcia-Beltran, stated that there had not, in fact, been probable cause. But police in all four cases believed there had been probable cause, as a necessary precondition of the arrests.
More important, the issue in all four cases was whether there was probable cause for the crime for which the defendants had been arrested. There is no such probable cause here. Under Proposition 69, the arrest is made for a felony, but the DNA sample is not taken to investigate that felony. It is taken to investigate another crime for which there is no probable cause. It is uncontested that the law enforcement officials who take the samples have no probable cause (or even reasonable suspicion) that the arrestee has committed another crime. Indeed, there may not even be another crime.
Second, the majority writes:
The other fatal flaw in the dissent’s novel construction of the Fourth Amendment is his entirely unsupported assumption that the information derived from compelled fingerprinting and DNA collection may only be used in connection with the crime for which probable cause was found.
Maj. Op. at 1061. I make no such assumption. It is established law that if fingerprints are lawfully taken — for example, for *1076 identification purposes — they may be used for later investigative purposes. Ortiz-Hernandez, 427 F.3d at 577; Garcia-Beltran, 389 F.3d at 868. I assume that this law applies equally to DNA samples. That is, if a DNA sample is lawfully taken, it may be used thereafter for investigative purposes. The problem under Proposition 69 is that the samples are not lawfully taken.
I conclude, based on Hayes, Davis, Ortiz-Hemandez, and Garcia-Beltran, that taking DNA samples from felony arrestees under Proposition 69, without consent, without a warrant, and without suspicion of any crime committed by the arrestee that the DNA will help solve, violates the Fourth Amendment.
IV. Totality of the Circumstances
The unconstitutionality of Proposition 69 is clear under Hayes, Davis, Ortiz-Hernandez, and Garcia-Beltran. The totality of the circumstances test applied by the majority is therefore irrelevant. I nonetheless address the majority’s application of the test to show that the majority has overstated the strength of the State’s interests in taking DNA samples from arrestees and has understated the strength of the plaintiffs’ privacy interests.
A. Interests of the State
The majority relies on four “key interests” of the State. Maj. Op. at 1062. I take them in turn.
1. Identification of Arrestees
The majority relies on California’s interest in the “identification of arrestees,” stating that this is the “primary purpose” of Proposition 69. Id. As I have just shown, the DNA taken from arrestees under Proposition 69 is not used to identify them. Rather, it is used solely to investigate.
2. Solving Past Crimes
The majority relies on the State’s interest in solving crimes, stating that inclusion of arrestees’ DNA profiles in the CODIS database “helps solve past crimes.” Id. at 1063-64. As noted above, DNA is taken from all felony arrestees almost immediately after their arrest. About one-third of the arrestees are never convicted of the felony for which they are arrested. About two-thirds of them are. The DNA of two-thirds of the felony arrestees would therefore be placed in the CODIS upon conviction even without Proposition 69. The State’s interest is thus served by Proposition 69 only to the extent that the DNA of arrestees who are never convicted of a felony is useful in solving crime, and to the extent that the DNA taken from those who are convicted is useful before the date of their conviction.
The majority states that ten months after Proposition 69 took effect “felony arrestee DNA samples had aided California police in 291 database hits.” Id. The basis for this statement is a declaration of Kenneth Konziak, a Laboratory Director and Technical Manager/Leader for the State of California DNA Data Bank Program. Mr. Konziak states that as of October 31, 2009, “CAL-DNA, used as an investigative tool, has recorded 10,664 hits.... Of these 10,-664 hits, so far 291 have involved arrestee submissions.”
However, the “arrestee submissions” to which Mr. Konziak refers in his declaration are submissions from all felony arrestees, including the submissions from the two-thirds of the arrestees who will be convicted. Without more, we have no way of knowing how many of the 291 “hits” were for arrestees who were later convicted. The hits for later-convicted arrestees should be excluded from the analysis, except to the extent that the hits were made because their DNA samples were analyzed *1077 earlier than they otherwise would have been.
The majority also provides examples of two crimes, committed by Donald Carter and Rene Hernandez, that have been solved through the use of DNA in the arrestee database. Maj. Op. at 1063-64. These are two of six examples given in the amicus brief filed in this court by the California District Attorneys Association. None of these six examples was provided to the district court. In none of them are we told that the DNA samples were provided by never-convicted arrestees. In five of the six examples, the brief states that the criminal charges were still pending; in the sixth, the brief is silent. Given the briefs description of the circumstances of the crimes that were charged in these six cases, it seems probable that all of the six will be, or by now have been, convicted of the felonies for which they were arrested.
It is likely that the inclusion of the DNA profiles of never-convicted California felony arrestees in the CODIS database under Proposition 69 will help solve some crimes, but based on the evidence presented to the district court we do not know how likely.
3. Preventing Future Crimes
The district court was presented with evidence purporting to show the effectiveness of Proposition 69 in preventing future crime, but the court gave it “little weight.” Haskell v. Brown, 677 F.Supp.2d 1187, 1201 (N.D.Cal.2009). The court wrote, “Though the government might be able to introduce more reliable evidence about the efficacy of arrestee DNA in preventing future crimes, it has not done so convincingly at this stage of the litigation.” Id.
Despite the district court’s statement, the majority writes, “DNA not only solves past crimes, but it helps police prevent crimes from occurring in the future.” Maj. Op. at 1064.
4. Exonerating Innocent Suspects
The district court gave little weight to the State’s interest in exonerating the innocent served by Proposition 69. It wrote, “At this stage of the litigation, this interest is not very strong. Though convicting the right person can theoretically serve to exonerate (or obviate the risk of investigating and prosecuting) the wrong person, the government has not yet introduced any evidence that the taking of arrestees’ DNA has led to either an increase in exonerations or a decrease in false aecusations/convietions.” 677 F.Supp.2d at 1201 n. 12.
Despite the district court’s statement, the majority writes that “the DNA database also allows law enforcement officers to eliminate innocent persons from suspect lists” and, in some cases, to free those who have been wrongly convicted. Maj. Op. at 1064-65. “There are few greater injustices than the wrongful imprisonment of an innocent person.” Id. at 1065.
The majority uses the famous Chester Turner case to support its argument that DNA testing of never-convicted arrestees serves to exonerate the innocent. David Jones was convicted in 1995 for three murders he did not commit. Turner was convicted of rape in 2002 and a DNA sample was then taken. Turner’s DNA profile matched DNA collected at two of the three murder scenes, and Jones was released from prison in 2004. If Turner’s DNA had been available in 1995, it likely would have prevented Jones’s wrongful conviction. But Proposition 69 was not necessary for this purpose. Turner had been convicted of a felony before 1995. If Turner’s DNA had been taken when he was convicted of that felony, as it could have been even without Proposition 69’s authorization of DNA collection from arrestees, it would have been available to exonerate Jones during the investigation of the murders.
*1078 B. Plaintiffs Privacy Interests
Our cases upholding mandatory DNA testing have started from the assumption of “ ‘severely diminished expectations of privacy’ ” for those who have been convicted of crimes. See Kriesel, 508 F.3d at 941 (quoting Samson, 547 U.S. at 852, 126 S.Ct. 2193). In those cases, we have found that felony parolees and those on supervised release are “ ‘not entitled to the full panoply of rights and protections possessed by the general public.’ ” Kriesel, 508 F.3d at 947 (quoting Kincade, 379 F.3d at 833).
This case, however, concerns arrestees. All four of the plaintiffs were arrested for felonies, but no plaintiff was convicted of the felonies for which he or she was arrested. Two of them were not even charged.
An arrestee does not have the same privacy interest as a person in the general population. See Rise, 59 F.3d at 1559-60 (holding those booking procedures requiring fingerprint identification of arrestees would be unlawful as applied to “free persons”). But we have repeatedly recognized that an arrestee has greater privacy interests than someone who has been convicted. See, e.g., United States v. Scott, 450 F.3d 863, 873 (9th Cir.2006) (holding that a “defendant out on his own recognizance before trial” possessed “privacy ... interests far greater than a probationer’s”).
The majority recites “numerous degrading physical and emotional intrusions” to which imprisoned arrestees are subject, Majority Op. at 1058, but it misunderstands the nature of the privacy interests and does not take into account the justifications for impinging on those 'interests. The invasive search procedures upheld in Bell v. Wolfish, 441 U.S. 520, 558 & n. 39, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) and Bullv. City & Cnty. of San Francisco, 595 F.3d 964, 971-73 (9th Cir.2010), were justified by the need for “security and order” in jails. Bell, 441 U.S. at 561, 99 S.Ct. 1861. The same is true of the opposite-sex monitoring of prisoners while in the shower and bathroom upheld by the Seventh Circuit. Johnson v. Phelan, 69 F.3d 144, 146 (7th Cir.1995) (noting the need for such monitoring because “inter-prisoner violence is endemic”).
The other intrusions cited by the majority have only been upheld in exigent or specialized situations. For example, the Eleventh Circuit has upheld the restraint and pepper-spray of an arrestee, but in that case, the arrestee “repeatedly placed officers’ lives and innocents’ lives in danger by engaging the police in a multicounty vehicle chase that did not end until [he] had crashed twice.” Garrett v. Athens-Clarke Cnty., Ga., 378 F.3d 1274, 1280 (11th Cir.2004). In Valdez v. Rosenbaum, we upheld a four-and-one-half month telephone-access restriction imposed on a pretrial detainee. 302 F.3d 1039, 1048 (9th Cir.2002). That restriction was imposed at the request of prosecutors “to prevent Valdez from tipping off his co-conspirators about the recently-issued indictments and, thereby, to ensure their capture with minimal danger to the arresting officers.” Id. at 1046.
Finally, the majority cites a case described in a newspaper article for the proposition that pretrial detainees can be “in lockdown for as much as 23)6 hours a day, always shackled in chains, even when taking a shower or making a phone call, and rarely being allowed to see daylight and breathe fresh air.” Maj. Op. at 1058. The majority misunderstands what happened in that case. The court did not find these conditions constitutional. Instead, the court held that the criminal defendant could not challenge them as a part of his criminal trial. The court denied the defendant’s motion “without prejudice to his right to file a separate civil action.” Order *1079 at 14, United States v. Morgan, No. 2:07-cr-00145-KDJ-PAL (D.Nev. Oct. 23, 2008), ECF 399.
The majority’s assessment of plaintiffs’ privacy interest turns on the analogy between fingerprints and DNA. We once observed that “information derived from the [DNA] sample is substantially the same as that derived from fingerprinting.” Rise, 59 F.3d at 1559-60. Our sister circuits have made similar observations. See United States v. Mitchell, 652 F.3d 387, 410 (3rd Cir.2011) (en banc) (“Given the record in front of us today, we conclude that a DNA profile is used solely as an accurate, unique, identifying marker — in other words, as fingerprints for the twenty-first century.”); Boroian v. Mueller, 616 F.3d 60, 67 (1st Cir.2010) (“Given the DNA Act’s stringent limitations on the creation and use of DNA profiles, CODIS currently functions much like a traditional fingerprint database, permitting law enforcement to match one identification record against others contained in the database.”); Banks v. United States, 490 F.3d 1178, 1192 (10th Cir.2007) (“These restrictions allow the Government to use an offender’s DNA profile in substantially the same way that the Government uses fingerprint and photographic evidence — to identify offenders, to solve past and future crimes, and to combat recidivism.”).
But our more recent decisions have explicitly recognized that DNA testing constitutes a greater infringement on privacy than fingerprinting. In Kriesel, we noted that “concerns about DNA samples being used beyond identification purposes are real and legitimate.” 508 F.3d at 947-48. In Kincade, a majority of the en banc court found that DNA testing represents a significantly greater infringement on privacy than fingerprinting. Judge Gould, concurring, wrote that “unlike fingerprints, DNA stores and reveals massive amounts of personal, private data about [an] individual.” 379 F.3d at 842 n. 3. “[U]nlike DNA, a fingerprint says nothing about the person’s health, their propensity for particular disease, their race and gender characteristics, and perhaps even their propensity for certain conduct.” Kriesel, 508 F.3d at 948 (quoting Kincade, 379 F.3d at 842 n. 3 (Gould, J., concurring)).
The majority stresses the limited subset of genetic information used by law enforcement to establish a DNA profile, so-called “junk DNA.” Maj. Op. at 1059. However, “studies have begun to question the notion that junk DNA does not contain useful genetic programming material.” Kincade, 379 F.3d at 818 n. 6 (citation omitted). “[W]ith advances in technology, junk DNA may reveal far more extensive genetic information.” Kriesel, 508 F.3d at 947.
Even with today’s technology, however, junk DNA reveals more information than a fingerprint. Unlike fingerprint patterns, which do not appear to be hereditary, DNA sampling reveals information about familial relationships. Identical twins do not have the same fingerprints, but they do have the same DNA. Siblings, parents, and children, who do not have similar fingerprints, have similar DNAs. Because of this similarity, DNA has been used for “familial searching,” in which law enforcement officials look for partial DNA matches between crime scene DNA samples and DNA profiles in CODIS. Defendants claim that California does not currently conduct such familial searches on arrestee DNA profiles, but the possibility — even likelihood — that California will begin conducting such searches in the future remains. But see Mitchell, 652 F.3d at 409 n. 19 (finding privacy concerns based on familial searching “speculative”).
Conclusion
We have never allowed the compulsory taking of DNA samples from mere arres *1080 tees. We should not begin now. Proposition 69 does not authorize the taking of DNA samples from felony arrestees for identification purposes. Rather, it authorizes the taking of DNA samples for solely investigative purposes. Such takings are unconstitutional under the Supreme Court’s decisions in Davis and Hayes, and under our decisions in Ortiz-Hernandez and Garcia-Beltran.
Because the unconstitutionality of Proposition 69 is clear under these cases, the totality of the circumstances test that we have applied in cases involving convicted felons is irrelevant. However, if I were to apply the test, I would find the State interests served by taking DNA samples from felony arrestees who will never be convicted of the felony for which they are arrested, and from arrestees before they are convicted of that felony, much weaker than the majority finds them. I would find the strength of plaintiffs’ privacy interests much stronger.
I respectfully dissent.

. The California Supreme Court has granted California's petition for review in People v. Buza, - Cal.4th -, 132 Cal.Rptr.3d 616, 262 P.3d 854 (2011). As a result, the appellate court's opinion has been withdrawn.